Dᴀɪʟʟɪᴇ C. EPPERSON *v.* S. W. SINGLETON ᴇᴛ ᴀʟ

5-5102                                        449 S. W. 2d 203

Opinion delivered January 19, 1970

*Brockman & Brockman,* for appellant.

*George N. Holmes,* for appellees.

J. FRED JONES, Justice. Daillie C. Epperson appeals from an adverse decree of the Jefferson County Chancery Court in a quiet title suit brought against her by S. W. Singleton and Lorenza Singleton involving Lot 1 of Block 9 of Brewster's Addition to the City of Pine Bluff. Most of the facts must be gleaned from the conflicting testimony, and as so derived, they place considerable strain on the broad powers of equity.

The lot involved in this litigation is 140 feet long north and south, and 50 feet wide east and west. A house sits on the north end of the lot with the north and south center line of the lot running through the center of the house. The Singletons had rented this property from Mrs. Epperson for $5 per month for about ten years prior to 1945, and the title record reveals that on March 23, 1945, Mrs. Epperson, then living in St. Louis, Missouri, executed a warranty deed to the Singletons to property described as follows:

> "The Western one-half of Lot 1, Block 9, of Brewster's Addition to the City of Pine Bluff, Arkansas, fronting 25 feet on the South Line of 22nd Street by a depth southwardly of 140 feet to an alley bounded on the East by a line 25 feet west of the west line of Louisana [sic] Street."

On the same date the Singletons executed a deed of trust on the same described property to John A. Davis to secure the payment of the balance of the purchase price in the amount of $400 payable in monthly payments of $17 each. Both the warranty deed and the deed of trust were filed for record on June 20, 1945.

On July 2, 1945, Daillie C. Epperson transferred to Frankie Virginia Epperson by warranty deed property described as follows:

> "The Eastern one-half of Lot 1, Block 9 of Brewster's Addition to the City of Pine Bluff, Arkansas, fronting 25 feet on the South line of 22nd Street by

a depth southwardly of 140 feet to an alley bounded on the East by Louisana [sic] Street."

On November 16, 1953, a foreclosure decree was entered of record in the Jefferson County Chancery Court wherein a Mr. Chavis, as attorney for Epperson, obtained a judgment for balance on principal of the deed of trust in the amount of $55.05, which together with costs, interest and taxes, amounted to $96.74, or which judgment was granted and the property was ordered sold at the end of 30 days if judgment not paid. The chancellor retained jurisdiction for the enforcement of the decree, but nothing further appears of record except a docket notation as follows:

"This case was settled and all indebtedness paid by Flowers for Singleton, to A. D. Chavis in my presence, but for some reason A. D. Chavis will not satisfy record."

The Singletons filed their suit from which comes this appeal on May 23, 1966, alleging that they are brother and sister; that they are the owners in possession of Lot 1, Block 9; that they acquired record title by warranty deed from Daillie C. Epperson to the west half of the lot; that it was the intention of the parties that all of Lot 1 should have been described in the deed. The Singletons claimed title by adverse possession for a period of 21 years.

Mrs. Epperson denied that she intended to convey to the Singletons anything other than the west half of the lot; that the balance decreed under the foreclosure decree has never been paid and that the court's retention of jurisdiction in the foreclosure decree tolled the statute of limitation on adverse possession.

Mr. Harold Flowers testified that he represented the Singletons as their attorney at the foreclosure suit and Mr. Chavis, now deceased, represented Mrs. Epperson.

He says that the entire amount of the judgment on foreclosure was paid by himself as Singletons' attorney to Mr. Chavis as Mrs. Epperson's attorney; that Mrs. Epperson would not accept the payment from her attorney but insisted instead that she was entitled to possession of the property.

The Singletons testified that their parents rented the house from Mrs. Epperson for ten years prior to purchasing it in 1945; that their parents actually made the purchase from Mrs. Epperson with the purpose and intent of purchasing all of the lot with the house thereon, and that they had used and been in possession of the entire lot and house ever since it was purchased in 1945.

Wesley Dorn and Jim Wittaker testified that they had observed the Singletons in possession of all of the lot for about thirty-five years.

Mrs. Epperson testified in her own behalf and her testimony is most difficult to follow. The record does not reveal whether Mrs. Epperson is simply unable to comprehend the questions asked her, or whether she consciously evades direct answers. In any event, the chancellor was in a better position to evaluate Mrs. Epperson's testimony than we are. Mrs. Epperson denies that she ever executed a deed to the Singletons at all, but from a close examination of all of her testimony. it appears that she may have confused the effect of her deed to the Singletons with that of a contract to sell under which she had previously purchased some real property. In any event, it appears that Mrs. Epperson could never understand why she could not simply repossess the property when the Singletons defaulted in payment giving rise to the foreclosure suit filed by Mrs. Epperson through her attorney.

The deed to the Singletons, as well as the deed of trust, was apparently prepared by Mrs. Epperson's at-

torney in St. Louis, and the description is very clear as to the area described. If no error was made in the description of the property the parties intended, then the intended sale of half of a house defies logic. As a matter of fact, however, the parties seem to agree that an error was made in describing what was intended to be conveyed. Mrs. Epperson says that there was an error made in the description and indicates that the error was in dividing the lot lengthwise rather than crosswise. The Singletons contend that an error was made in describing half of the lot and house instead of the whole lot and house. The Singletons indicated that they only discovered the error after several years, whereas Mrs. Epperson testified that she discovered the error a month or so after the deed was executed.

> "A. Oh, I found it out shortly after the thing was wrote.
>
> Q. You mean just a year or so?
>
> A. No, I found it out shortly.
>
> Q. A month or so?
>
> A. That's right."

Instead of attempting to correct the deed to conform to her understanding of what was to be conveyed, Mrs. Epperson deeded the east half of the lot to her daughter, Frankie Virginia Epperson, and here the legal record title to the east half lay until reconveyed to Mrs. Epperson by quitclaim deed on February 14, 1969.

The chancellor found that although an error had been made in the description in the deed of conveyance from Epperson to the Singletons, the nature of the error was not clear enough to justify a reformation of the instrument. The chancellor found, however, that Mrs. Epperson was estopped from claiming title to the property; that the Singletons had held possession of the

property adversely for a period of more than twenty years and title was confirmed in the Singletons.

Mrs. Epperson contends for reversal that the chancellor erred in holding that a mistake had been made in the deed when no mistake was alleged and no motion was made to amend the pleadings to conform to the proof. We do not agree. The Singletons alleged in their complaint that it was the intention of the parties at the time of the conveyance to convey all of Lot 1 to them. The chancellor did not decree a reformation of the deed and this case does not turn on the error of description in the deed. Both sides agree that an error was made in describing the property to be conveyed, but they do not agree on what was intended. The Singletons contend that they bought and paid for the entire house and lot, and Mrs. Epperson contends that even though she never did sign a deed, she only agreed to sell the *house to the* Singletons.

Mrs. Epperson named several competent attorneys who represented her throughout the entire transaction pertaining to this property and she says she learned of the error in description within three months of the execution of the instruments containing the erroneous descriptions. Instead of attempting to correct the error by reformation, Mrs. Epperson compounded the error by transferring title to the east half of the lot to her daughter, who did not testify and apparently never did question the Singletons' right of possession in the entire lot.

Mrs. Epperson contends that the chancellor erred in admitting testimony to vary the terms of a written instrument. We do not agree with this contention. No one questioned the terms of the deed or the wording of the description. The west half of the lot was conveyed under the deed. The question was not whether the deed description accurately described the land therein conveyed, the question was whether the deed conveyed by accurate

description the property the Singletons intended to purchase and Mrs. Epperson intended to sell. Both the Singletons and Mrs. Epperson say that it did not, but they differ considerably on what was intended.

Mrs. Epperson also questions the preponderance of the evidence as to adverse possession, but we are of the opinion that the chancellor's decree is not against the preponderance of evidence that the Singletons had established adverse possession. It is true that there is some evidence of record that Mrs. Epperson instituted two actions of some kind against the Singletons in municipal court in which she alleged that the Singletons were trespassers on her property, but the record also indicates, from Mrs. Epperson's own incredible testimony, that she never did agree, know, or recognize, even in spite of her foreclosure suit, that she had ever execupied both sides of the house; they cutivated a garcuted a deed to the Singletons at all. The Singletons occden on the south half of the lot; they used and maintained an outhouse on the back of the lot, and the evidence is clear that Mrs. Epperson knew that the Singletons were claiming ownership in both sides of the house and right to immediate possession of the property inin 1945.

Considerably more could be said here as to the points raised by the appellant, but it is obvious from the record before us that Mrs. Epperson did in 1945 convey one-half of a house and lot to the Singletons, and that the Singletons have been in possession of both sides of the house, as well as the entire lot the house sits on, since the deed was executed. It is obvious from the record that despite her representation by competent counsel, Mrs. Epperson has simply never been able to accept the fact that she has ever divested herself of title and both sides of the lost from the date of their deed volved in this case.

We agree with the chancellor that the foreclosure

suit was fully consummated upon entry of a decree for the amount due and the order for sale if not paid in thirty days. No appeal was ever perfected from this decree. The docket entry of record reflects that the amount of the decree was paid within thirty days and that a sale of the property was no longer permissible under the decree. The record is not clear as to what happened to the amount paid under the decree. Attorney Flowers says it was paid to Mrs. Epperson's attorney and later refused by Mrs. Epperson. The payment in open court is confirmed by deputy circuit clerk Mrs. Evelyn Harris. Mrs. Epperson denies that she refused to accept the payment, but also denies that she ever did receive it, or that it was ever tendered to her. Mrs. Epperson admits that she wanted possession of the property more than she wanted the balance the Singletons owed on it, and she indicates that she still does.

"Q. Well now I'll ask you today if you were given all the money that you say was owed to you would that satisfy you and would you go on back to St. Louis and live happily?

A. No, I need the house myself because I am unable to work."

The decree is affirmed.

HARRIS, C. J., and BYRD, J., not participating.

FOGLEMAN, J., concurs.

JOHN A. FOGLEMAN, Justice, concurring. I agree with the majority opinion except as to the disposition of appellant's contention that the trial court erred in holding that it did not have jurisdiction of the action for a foreclosure sale. The majority relies upon payment of the mortgage debt as determined by the foreclosure decree. The chancellor did not make a finding that the decree was satisfied by payment, although he said that

a docket notation by the clerk that the amount had been paid to appellant's attorney was of considerable significance. Payment seems rather doubtful to me because the attorney who purportedly made the payment on behalf of appellees testified that the money paid was returned to him by the attorney for appellant to whom it was paid.

On the other hand, the record clearly sustains the finding of the chancellor that the foreclosure decree was barred by the 10-year statute of limitations. See Ark. Stat. Ann. § 37-212 and § 29-601 (Repl. 1962). Proceedings under such a decree are barred after 10 years. *Ford* v. *Harrison,* 69 Ark. 205, 62 S. W. 59, 86 Am. St. R. 192; Hughes, Arkansas Mortgages, § 418. Appellee argues that the statutory bar is inoperative because the chancery court, in its foreclosure decree, retained jurisdiction of the foreclosure proceedings. I do not agree with this contention. In *Morehead* v. *Niven,* 222 Ark. 116, 257 S. W. 2d 361, we said that such a retention of jurisdiction meant only that the parties might go into that suit for further relief within apt time. "Apt time" means to me within the period allowed by the applicable statute of limitations, unless laches shall operate as a bar at an earlier date.